**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Wilcox*, Slip Opinion No. 2024-Ohio-5719.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-5719

THE STATE OF OHIO, APPELLANT, *v.* WILCOX, APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Wilcox*, Slip Opinion No. 2024-Ohio-5719.]**

*Criminal law—Confrontation Clause of Sixth Amendment to United States Constitution—Absent witness's statements to law-enforcement officers captured on body-camera video that were given before defendant's apprehension were nontestimonial because officers were responding to an ongoing emergency—Absent witness's statements captured on body-camera video after defendant's apprehension were testimonial, and admission of those statements violated defendant's right to confrontation—Court of appeals' judgment reversed and cause remanded.*

(No. 2023-1204—Submitted July 9, 2024—Decided December 10, 2024.)

APPEAL from the Court of Appeals for Hamilton County, No. C-220472, 2023-Ohio-2940.

_____

FISCHER, J., announced the judgment of the court, with an opinion joined by DONNELLY and BRUNNER, JJ. STEWART, J., concurred in judgment only, with an opinion. DEWINE, J., concurred in part and dissented in part, with an opinion joined by KENNEDY, C.J., and HUFFMAN, J. MARY KATHERINE HUFFMAN, J., of the Second District Court of Appeals, sat for DETERS, J.

**FISCHER, J.**

{¶ 1} We examine in this case whether the admission during a criminal trial of statements captured on body-camera footage violated the defendant's right to confrontation. As explained below, we conclude that the initial statements in question were nontestimonial, as the law-enforcement officer's primary purpose at that stage of the investigation was to address an emergency situation. The latter statements, however, were testimonial, because they were made after the suspect was apprehended and therefore were not given to assist in addressing an emergency situation. We therefore reverse the judgment of the First District Court of Appeals and remand the case to that court for it to determine whether the nontestimonial statements were admissible under the Ohio Rules of Evidence and to conduct a harmless-error analysis.

## FACTUAL AND PROCEDURAL BACKGROUND

{¶ 2} In August 2020, appellee, Quantez Wilcox, agreed to meet his ex-girlfriend, Doniesha Monroe, near the public library in downtown Cincinnati. He was seated in his parked car and was talking to her when they were approached by Keshawn Turner, Monroe's boyfriend at the time. Monroe and Turner quarreled. During this argument, Wilcox testified, it appeared to Wilcox that Turner was trying to pull a gun out of his holster, and in response, Wilcox pulled his own gun and shot Turner. The record indicates that no one other than Monroe, Turner, and Wilcox witnessed the shooting. Turner ultimately died from his gunshot wound.

{¶ 3} As Turner and Monroe attempted to flee the scene on foot, Wilcox fled in his car. Approximately a block away from the scene of the shooting, a police officer saw Wilcox's vehicle run a red light, and he initiated a traffic stop. While questioning Wilcox during the traffic stop, the officer received information on his radio that Wilcox was the suspect in a shooting. The officer arrested Wilcox and informed police dispatch that he had secured Wilcox in the back of his patrol vehicle.

{¶ 4} While the traffic stop was taking place, a police officer arrived at the scene of the shooting and began questioning Monroe. The questioning was recorded by the officer's body camera. Monroe immediately identified Wilcox as the shooter and gave the officer details about Wilcox to help locate him. Approximately halfway through the nearly 12-minute interview recorded on the officer's body camera, the officer relayed this information over his radio to police dispatch and was immediately informed that Wilcox had been apprehended. The officer asked Monroe a few more questions, and Monroe gave statements about alleged past bad acts that Wilcox had committed against her.

{¶ 5} Wilcox was indicted on multiple felony counts, including murder, having weapons under disability, and tampering with evidence. During trial, after it became clear that Monroe would not appear in court to testify, Wilcox objected to the State's request to show the officer's body-camera footage on the basis that admission of that evidence would violate his federal right to confrontation. The trial court allowed the body-camera footage to be admitted into evidence. Wilcox was ultimately found guilty on the counts tried by the State.

{¶ 6} In a two-to-one decision, the First District affirmed Wilcox's convictions for having weapons under disability and tampering with evidence but reversed the murder conviction and remanded the matter to the trial court for a new trial on the that charge. 2023-Ohio-2940, ¶ 46 (1st Dist.). In addressing the State's argument that admission of the body-camera footage into evidence did not violate

Wilcox's right to confrontation, the court first noted that the State had failed to set forth any substantive analysis of that issue in its appellate brief:

> [T]he state does not substantively address the argument, beyond making a general allegation that Ms. Monroe's statements fell within certain categories of admissible hearsay statements. It seems to acknowledge that the statements were testimonial in nature, but it does not clarify its position. And it fails to reconcile the distinction between admissibility for hearsay purposes and constitutional requirements under the Confrontation Clause [of the Sixth Amendment to the United States Constitution].

*Id*. at ¶ 18.

{¶ 7} The court of appeals determined that "the video does contain several statements in response to police questions that could be viewed as addressing an ongoing emergency" but that "the main thrust of the video implicates the Confrontation Clause." *Id*. at ¶ 20. The court concluded that the statements captured on the body-camera footage were testimonial because "the primary purpose of . . . [the officer's] questioning of Ms. Monroe was to gather facts regarding a past crime for later prosecution." *Id*. at ¶ 21. Because Monroe was not present and available for cross-examination during trial, the court of appeals held that admission of the body-camera footage into evidence violated Wilcox's right to confrontation. *Id*. at ¶ 23. The court held that this was not harmless error, *id.* at ¶ 25, and that the trial court's error warranted reversal of Wilcox's murder conviction, *id.* at ¶ 46. The First District remanded the matter for a new trial on that charge. *Id*.

{¶ 8} The judge who concurred in part and dissented in part concluded that Monroe's statements were nontestimonial and were admissible as evidence under

the excited-utterance exception to the hearsay rule. *Id*. at ¶ 47 (Winkler, J., concurring in part and dissenting in part). This judge reasoned that the officer whose body camera captured Monroe's statements "was not sure that the suspect had been apprehended" when he was questioning Monroe and that under the totality of the circumstances, all Monroe's statements were nontestimonial since the officer was seeking information to appropriately respond to an ongoing emergency, not to gather facts for a later prosecution. *Id*. at ¶ 59 (Winkler, J., concurring in part and dissenting in part).

{¶ 9} We accepted jurisdiction over the State's sole proposition of law: "Video footage of the response of a witness in the immediate aftermath of a shooting is not 'testimonial' and does not interfere with a defendant's right to confrontation." *See* 2023-Ohio-4410.

## ANALYSIS

{¶ 10} The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In *Crawford v. Washington*, 541 U.S. 36 (2004), the United States Supreme Court explained that the key question for determining whether a Confrontation Clause violation has occurred is whether an out-of-court statement is "testimonial." *Id.* at 59, 68. If a statement is testimonial, its admission into evidence will violate the defendant's right to confrontation if the defendant does not have an opportunity to cross-examine the declarant. *Id*. at 53-56.

{¶ 11} To determine whether a statement is testimonial, courts must look to post-*Crawford* decisions to ascertain whether the statement bears indicia of certain factors that would make it testimonial. For example, the primary purpose of a testimonial statement is to create an out-of-court substitute for trial testimony. *Ohio v. Clark*, 576 U.S. 237, 245 (2015). That primary purpose must be measured objectively by the trial court, accounting for the perspectives of the interrogator and

the declarant.  *Michigan v. Bryant*, 562 U.S. 344, 367-368 (2011).  Also important to consider is whether the statement was made during an ongoing emergency, i.e., whether there was a continuing threat to the victim.  *Id*. at 363-365.  An emergency may cease to exist if the declarant provides law-enforcement officers with information that indicates the emergency no longer exists or if the perpetrator is disarmed or apprehended.  *Id*. at 365.  Moreover, a conversation that begins as an interrogation to determine the need for emergency services may evolve into a testimonial statement once the purpose of rendering emergency assistance has been achieved.  *Davis v. Washington*, 547 U.S. 813, 828 (2006).

{¶ 12} The United States Supreme Court has concluded that an ongoing emergency renders a statement nontestimonial when the victim makes a statement to an operator during a 9-1-1 call.  *See id*. at 818, 827-828.  In *Davis*, the Court noted that the declarant made statements as the events in question were happening, and it reasoned that those statements constituted a call for help against a bona fide physical threat, making those statements nontestimonial.  *Id*. at 827-828.  On the other hand, the Court stated that statements made to law-enforcement officers by a victim of domestic violence after the officers had secured the perpetrator in another part of the home were testimonial, because those statements were neither a cry for help nor the provision of information enabling the officers to immediately end a threatening situation; rather, they were given to establish events that had occurred previously.  *Id*. at 819-820, 831-832.

{¶ 13} We conclude that this case involves the type of scenario discussed in *Davis* in which statements made by the declarant evolved from being nontestimonial to testimonial during the course of police questioning.  When the police officer began questioning Monroe, he had no indication that the shooting suspect had been apprehended.  Viewing this officer's questioning objectively, we find that the primary purpose of the initial questioning was to gather information necessary to respond to an ongoing emergency.  Thus, the officer's initial

questioning elicited nontestimonial statements from Monroe, and the First District erred in concluding that those statements were testimonial.

{¶ 14} Halfway through the questioning, however, after the police officer relayed Wilcox's name and identifying information over his radio, the officer was told, "We have him in custody." This statement, which is clearly audible on the body-camera footage, unequivocally demonstrates that the person identified by Monroe as the shooter had been apprehended by the police, and at that point, there was no longer an ongoing emergency. Thus, from that point forward, the statements given by Monroe were testimonial since they were not given to assist the officer in addressing an ongoing emergency but rather, to establish events that had occurred previously. The First District did not err in concluding that these postapprehension statements were testimonial.

{¶ 15} As explained above, the First District incorrectly concluded that the statements given by Monroe prior to the police officer's learning that Wilcox had been apprehended were testimonial. Because those statements were nontestimonial, their admission into evidence did not violate Wilcox's right to confrontation.

{¶ 16} Whether Monroe's initial statements captured on the police officer's body-camera footage were properly admitted into evidence thus hinges on whether the statements constituted inadmissible hearsay. Two factors prevent us from deciding that question in this appeal. First, the hearsay question is beyond the scope of this appeal, as the State's sole proposition of law involves only whether Monroe's statements captured on video were testimonial and whether the admission of those statements into evidence violated Wilcox's right to confrontation. Because the hearsay question is beyond the scope of the proposition of law that we accepted for review, we decline to consider that issue in this appeal. *See Epcon Communities Franchising, L.L.C. v. Wilcox Dev. Group, L.L.C.*, 2024-Ohio-4989, ¶ 24.

**{¶ 17}** Second, the First District did not have an opportunity to consider that question, because it concluded that the admission of the statements into evidence violated Wilcox's right to confrontation, thus mooting the hearsay question.[1] Because the First District did not have a chance to address this issue, we will not consider it in the first instance. *See Sizemore v. Smith*, 6 Ohio St.3d 330, 333, fn. 2 (1983) ("This court should be hesitant to decide [issues that were not raised or argued by the parties] for the reason that justice is far better served when it has the benefit of briefing, arguing, and lower court consideration before making a final determination."). Instead, we remand the case for the First District to consider that issue.

**{¶ 18}** Because we do not reach the hearsay issue, we cannot conduct a harmless-error analysis as advocated for by the State, amicus curiae the Ohio Attorney General, and the opinion concurring in part and dissenting in part. A new harmless-error analysis cannot be conducted until the admissibility of the nontestimonial statements from the police officer's initial questioning of Monroe has been determined, because whether those statements were admissible will have a direct impact on the harmless-error analysis.

**{¶ 19}** The opinion concurring in part and dissenting in part repeatedly asserts that if the trial court erred in admitting the testimonial statements in the second half of the body-camera video, that that error was harmless because those statements were cumulative of the nontestimonial statements made in the first half of the video. *See* opinion concurring in part and dissenting in part, ¶ 27, 45, 47-48.

---

1. The opinion concurring in part and dissenting in part asserts that "[t]he First District should have adhered to the 'well established' constitutional-avoidance principle and decided the evidentiary hearsay issue before reaching the constitutional Confrontation Clause issue." Opinion concurring in part and dissenting in part, ¶ 40, fn. 1. But this court has never applied the constitutional-avoidance doctrine to avoid analyzing alleged evidentiary violations that implicate both the Confrontation Clause and the Ohio Rules of Evidence. Quite the opposite: In *State v. Jones*, we said, "Because certain testimonial statements are barred by the Confrontation Clause of the Sixth Amendment to the United States Constitution irrespective of their admissibility under the Rules of Evidence, we undertake the constitutional inquiry first," 2012-Ohio-5677, ¶ 136.

But that approach merely highlights why we cannot conduct the harmless-error analysis at this time. To reach its conclusion that any error was harmless because any testimonial statements were cumulative of the nontestimonial statements, the opinion concurring in part and dissenting in part must assume that the first half of the video was properly admitted into evidence. But that is precisely the analysis that the First District must conduct on remand. We cannot hold that the admission of the second half of the video was cumulative and therefore harmless when we do not know whether the first half of the video was admissible. Because we remand the case to the First District so that that court may consider the hearsay question in the first instance, we cannot make a harmless-error determination at this time.

{¶ 20} Furthermore, the opinion concurring in part and dissenting in part is mistaken when it asserts that we are sending "the case back to the court of appeals to sort out whether the admission of the second part of the video constituted harmless error," *id.* at ¶ 26. Rather, we are remanding the case for the First District to determine whether the first half of the video is admissible under the Rules of Evidence regarding hearsay. Once it has made that determination, then it must determine whether the trial court's improper admission of the second half of the video was harmless. If the First District finds that the first half of the video was improperly admitted hearsay, then it must conduct a harmless-error analysis for the entire video. If the First District finds that the first half of the video was properly admitted, *only then* may it conduct a harmless-error analysis regarding the admission of the second half of the video. The admission of both halves of the video are inextricably linked, and this court cannot determine whether the admission of one half was harmless without determining whether the other half was properly admitted.

## CONCLUSION

{¶ 21} Because the police officer's primary purpose in eliciting the statements that Monroe made prior to Wilcox's apprehension was to address an

ongoing emergency, those statements were nontestimonial. The First District Court of Appeals accordingly erred when it concluded that the admission of those statements into evidence violated Wilcox's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. We therefore reverse the First District's decision on this basis. We remand the case to that court so that it may determine in the first instance whether those nontestimonial statements were admissible. After making that determination, the First District must revisit its harmless-error determination and address Wilcox's remaining assignments of error, as necessary.

Judgment reversed

and cause remanded.

_____

**STEWART, J., concurring in judgment only.**

{¶ 22} I do not disagree with the lead opinion's legal analysis of the Confrontation Clause of the Sixth Amendment to the United States Constitution as applied to the facts of this case, nor do I disagree with the decision to remand this case to the First District Court of Appeals to decide the hearsay and harmless-error questions in light of this court's decision regarding whether the statements at issue were testimonial. However, I do not believe we should even reach the Confrontation Clause argument, because appellant, the State of Ohio, forfeited the argument that there was an ongoing emergency by failing to raise that claim below or in its initial memorandum filed with this court. *See State v. Rogers*, 2015-Ohio-2459, ¶ 21 ("forfeiture is the failure to timely assert a right or object to an error").

{¶ 23} The First District noted the State's failure to address the Confrontation Clause argument: "[The State] seems to acknowledge that the statements were testimonial in nature, but it does not clarify its position. And it fails to reconcile the distinction between admissibility for hearsay purposes and

constitutional requirements under the Confrontation Clause." 2023-Ohio-2940, ¶ 18 (1st Dist.). Despite this explicit critique, the State also did not raise an "ongoing emergency" argument in its memorandum in support of jurisdiction filed with this court; instead, it focused once again on hearsay arguments.

{¶ 24} Additionally, although the State did raise an ongoing-emergency argument in its merit brief, that is not part of the proposition of law this court accepted for review. As the lead opinion notes, this court will not analyze questions outside the proposition of law accepted for review. *See* lead opinion, ¶ 16. Since the ongoing-emergency argument was not part of the State's proposition of law, let alone anywhere in its memorandum in support of jurisdiction, this court should not address the issue. And to be clear, the late presentation of the ongoing-emergency argument does not change the fact that the State forfeited the argument in its appeal to the First District.

{¶ 25} We traditionally do not decide cases based on forfeited arguments, but since I agree that the lead opinion's legal analysis of the Confrontation Clause argument is correct but for the State's forfeiture of that argument, I concur in judgment only.

_____

**DEWINE, J., joined by KENNEDY, C.J., and HUFFMAN, J., concurring in part and dissenting in part.**

{¶ 26} The question in this case is whether it violated Quantez Wilcox's rights under the federal Confrontation Clause to admit at his trial a police officer's bodycam video, recorded during the officer's immediate response to a reported shooting. To answer that question, we need to determine whether the witness's statements to the officer in the video were testimonial. That is, we must decide whether the primary purpose of the officer's questioning of the witness was to serve as a substitute for courtroom testimony. The lead opinion, however, makes no real

effort to examine the video. Instead, it declares that the witness's statements in the first six and half minutes of the 12-minute video were nontestimonial and that the statements in the remainder were testimonial. It then sends the case back to the court of appeals to sort out whether the admission of the second part of the video constituted harmless error.

**{¶ 27}** There are at least two problems with the lead opinion. First, it incorrectly holds that the entire second part of the video was testimonial. Second, it ignores the fact that all the relevant statements contained in the second part of the video were cumulative of those made in the first part of the video and thus admitting the second part of the video could not have prejudiced Wilcox. Rather than send the Confrontation Clause issue back to the court of appeals, we should reverse on that issue and remand for consideration of the remaining assignments of error.

## I. Background

**{¶ 28}** This case is about the contents of a police officer's bodycam video. Specifically, it's about Officer David Price's questioning of Doniesha Monroe in the video shortly after Wilcox shot her boyfriend. In the video, a clearly distraught Monroe interacts with Officer Price and another officer.

**{¶ 29}** The First District held that admission of the video at trial violated Wilcox's rights under the federal Confrontation Clause. We accepted this case on a proposition of law that asserts that the video taken in the immediate aftermath of the shooting was not testimonial and therefore did not violate Wilcox's Confrontation Clause rights.

**{¶ 30}** The lead opinion quickly concludes that in the first six and a half minutes of the video, "the primary purpose of the initial questioning was to gather information necessary to respond to an ongoing emergency," which made the witness's statements nontestimonial and the Confrontation Clause inapplicable. Lead opinion, ¶ 13. It then zeroes in on a single statement—one and a half seconds out of a nearly 12-minute-long video—to conclude that the emergency certainly

ended, and that the remaining five and a half minutes of the video contained only testimonial statements whose admission into evidence violated the Confrontation Clause. *Id.* at ¶ 14. And rather than inspect the video to determine whether the admission of those statements prejudiced Wilcox, a majority of this court remands the case to the First District to do that work. *Id.* at ¶ 17.

**{¶ 31}** Other than its snap conclusion that the first six and a half minutes was nontestimonial and the last five and a half minutes testimonial, the lead opinion provides no real analysis of the video. But because cases like this are "highly context-dependent," *Michigan v. Bryant*, 562 U.S. 344, 363 (2011), and require a careful parsing of each statement to determine whether they "evolved from being nontestimonial to testimonial during the course of police questioning," lead opinion at ¶ 13, I begin with the video evidence.

### A. *The first six and a half minutes of the video*

**{¶ 32}** The video begins with Officer Price responding to a reported shooting. As soon as he arrives at the scene, he is told that "there is somebody with a gun" and that a man was shot. In the video, you can see an unresponsive man lying on his back nearby. People are pacing and shouting with breathless, frantic voices. Officer Price asks generally, "Did you guys see anything?" Doniesha Monroe responds, "Yes I know who did it I was standing right there." Officer Price then takes her to the side to question her about the shooting. A sobbing Monroe tells Officer Price that the man who was shot in the chest was her boyfriend, Keshawn Turner. Officer Price then asks her what happened. She tearfully replies:

> I was standing at the car. I've made multiple, um, reports about my ex back when he busted out my windows. They said he couldn't get the cameras but I told them that I watched him do it. When I called his name he ran away. He shot at my car and then we was just walking past right there and he shot at him.

Monroe proceeds to identify the shooter as Quantez Wilcox, her ex-boyfriend. And she tells Officer Price that Wilcox fled the scene in a car after the shooting.

{¶ 33} A woman then approaches Monroe to comfort her, telling Officer Price, "I don't know her, but I want to know that she's OK." Officer Price tells the woman she needs to leave because the police are "trying to put pieces together."

{¶ 34} After the woman leaves, Officer Price continues to speak to Monroe. She gives Officer Price information to help track Wilcox down, including his name, age, and birthday, the make and color of the car that he fled in, and a description of what he was wearing. Officer Price provides this information to dispatch over the radio. A dispatcher then relays the information back over the radio—presumably to all on-duty officers. A few seconds later, a voice over the radio says, "We have him in custody." Several more seconds later, Officer Price tells Monroe, "OK, I think we have him in custody, maybe."

*B. The final five and a half minutes of the video*

{¶ 35} The news that a suspect might be in custody causes no discernable change in the demeanor of Officer Price or Monroe. Officer Price continues to ask Monroe questions about herself and the shooting. And Monroe repeats much of what she has already told Officer Price.

{¶ 36} In this segment of the video, Monroes continues to speak through tears and with a shaky, hurried voice. Because of her distress and agitation, Officer Price asks her to take a seat in his car, but Monroe blurts out, "I can't sit down, I'm sorry, I can't." Officer Price responds, "OK, I under—, OK I understand. That's OK. I wish I had a water or something to give to you." After making sure she has all of her belongings, Officer Price asks Monroe, "What was the other guy mad about? Your ex-boyfriend?" She hastily lets loose a stream of facts:

14

He's my ex. Yes. But I, but I'm, I constantly made reports. I made a court, a report, cuz my car was parked in a parking lot, I went downstairs for work, and my car was shot at. I can't really pinpoint that on him because like I said I didn't see. But my windows busted out. He didn't even know I was walking through the parking lot and I see him busting the windows out. And District One got their report, like I kept making reports, I kept making reports.

**{¶ 37}** Officer Price stays with Monroe while he works with another male officer at the scene to determine whether the person that another witness saw just before the shooting was Wilcox, or some other suspect. Monroe is still noticeably shaken—so much so that a female officer approaches her and twice asks, "Anything I can do to help you?" When the female officer confirms that Monroe was the victim's girlfriend, she asks Monroe if they "have any children." Monroe responds that she is three months pregnant. The female officer—apparently concerned about the health of Monroe's child—immediately tells her, "You gotta calm down—you know that then, don't you." The female officer then takes Monroe away from the scene so she doesn't have to keep watching her mortally wounded boyfriend get treatment from the EMS.

**{¶ 38}** After the female officer leads Monroe away, Officer Price asks the other male officer, "Didn't they say they had him in custody? Or was that something else?" The video cuts off shortly after, with the male officer giving Officer Price a physical description of a possible suspect that he obtained from the other witness.

## II. The witness's statements in the entire video were nontestimonial because the primary purpose of the questions was to respond to an ongoing emergency

{¶ 39} "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const, amend. VI. That generally means that a witness's testimonial statements can't be admitted into evidence at trial unless the defendant has an opportunity to cross-examine that witness. *Crawford v. Washington*, 541 U.S. 36, 53-56 (2004). But nontestimonial statements don't implicate the Confrontation Clause at all. *See id.* at 68.

{¶ 40} To determine whether a statement is testimonial or nontestimonial, we must determine the "primary purpose" of the questions that the police asked the witness. *Bryant*, 562 U.S. at 370. If the primary purpose of police questioning was to obtain evidence for trial, the statements in response are testimonial. *Id.* at 358. But if the primary purpose of police questioning was to gather information to respond to an ongoing emergency, the statements in response are nontestimonial.[2] *Id.* And "[t]o determine whether the primary purpose of [police questioning was] to enable police assistance to meet an ongoing emergency, which would render the resulting statements nontestimonial, we objectively evaluate the circumstances in

2. The opinion concurring in judgment only argues that the State forfeited its ongoing-emergency argument because it "fail[ed] to raise that claim below or in its initial memorandum filed with this court." Opinion concurring in judgment only, ¶ 22. It makes that argument because the State didn't specifically argue that the relevant statements were made in response to an ongoing emergency until its merits brief in this court. *See id.* at ¶ 23-24. But it conflates the argument that the State makes with evidence that supports that argument. The State has consistently argued that the statements in the bodycam video are "not 'testimonial' under *Crawford v. Washington*." In fact, the State's proposition of law that we accepted is that "[v]ideo footage of the response of a witness in the immediate aftermath of a shooting is not 'testimonial' and does not interfere with a defendant's right to confrontation." Lead opinion at ¶ 9. And whether that's true in this case is informed by whether the police were responding to an ongoing emergency. *See Bryant* at 358. The State therefore preserved its nontestimonial argument and is allowed to point to evidence that supports that argument—such as evidence that suggests that there was an ongoing emergency.

which the encounter occur[red] and the statements and actions of the parties." (Cleaned up.) *Id.* at 359.

{¶ 41} That brings me back to the bodycam video. The objective evidence indicates that the primary purpose of Officer Price's questioning was to enable police assistance to meet an ongoing emergency. Consider the circumstances. When Officer Price arrived at the scene of the shooting, people were frantically looking for help after having just watched a man get shot in the chest. It was chaotic. And as the lead opinion notes, there was "no indication that the shooting suspect had been apprehended." Lead opinion at ¶ 13. For all anyone knew, an armed gunman was still on the loose. The lead opinion therefore correctly concludes that Monroe's statements in the first six and a half minutes of the video were nontestimonial because the primary purpose of Officer Price's questioning was to facilitate a police response to an ongoing emergency.

{¶ 42} But the lead opinion is wrong that the primary purpose of the questioning changed. It's true that a voice over the radio said "we have him in custody" after dispatch relayed the information about Wilcox that Officer Price had learned from Monroe. But that doesn't "unequivocally demonstrate[]" that in the minds of the participants "there was no longer an ongoing emergency," lead opinion at ¶ 14.

{¶ 43} We must look to "the statements and actions of the parties" to determine whether Officer Price's questions were directed toward responding to what was reasonably believed to be an ongoing emergency. *Bryant* at 359. Despite the lead opinion's claim that the statement over the radio "unequivocally demonstrates" that the shooter had been apprehended, Officer Price immediately reacted with a tentative, "I think we have him in custody, maybe." Toward the end of the video, Officer Price still needed to ask, "Didn't they say they had him in custody? Or was that something else?" Additionally, the other male officer was still chasing down a lead on another possible suspect. And all the while, Monroe

was so visibly and audibly distraught that multiple people felt compelled to try to comfort her.

{¶ 44} In hindsight, and based on a single statement over the radio, it may appear clear to the justices joining the lead opinion that there was no longer an ongoing emergency. But "the focus must be on the perspective of the parties at the time of the interrogation, and not based on hindsight, for '[i]f the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief was later proved incorrect, that is sufficient for purposes of the Confrontation Clause.' " (Brackets in original.) *State v. Jones*, 2012-Ohio-5677, ¶ 150, quoting *Bryant* at 361, fn. 8. Here, the objective evidence at the time of the questioning—including "the circumstances in which the encounter occur[ed] and the statements and actions of the parties," *Bryant* at 359— indicates that Officer Price, Monroe, and both the other officers in the video were under the impression that there may have still been an ongoing emergency and that Monroe still needed to be cared for. Therefore, there is no nontestimonial/testimonial split in the video. The primary purpose of all the questioning was to help deal with an ongoing emergency—not to collect evidence for trial.

### III. Admitting the entire video into evidence did not constitute prejudicial error

{¶ 45} Even if the lead opinion is right about the nontestimonial/testimonial split, admitting the entire bodycam video into evidence was harmless error. Any relevant testimonial statement that was erroneously admitted was cumulative of nontestimonial statements already admitted into evidence.

{¶ 46} Confrontation Clause violations are harmless when there is still " " "overwhelming proof" " " of the defendant's guilt without the erroneously admitted evidence. *Carter* at ¶ 47, quoting *State v. Hood*, 2012-Ohio-6208, ¶ 43, quoting *State v. Williams*, 6 Ohio St.3d 281 (1983), paragraph six of the syllabus.

"Accordingly, the admission of purely cumulative evidence in violation of the Sixth Amendment amounts to harmless error." *Id.*

{¶ 47} Again, that brings me to the video. The only relevant statements that Monroe made after the point in the video at which the lead opinion says the interaction turned testimonial were repeats of statements that she had already made during the nontestimonial portion of the exchange. In other words, the witness's statements in the second part of the video were merely cumulative of her nontestimonial statements that were already in evidence. Specifically: that Wilcox was her ex-boyfriend, that she had filed many reports against him, that he had shot at her car, and that he had busted out her car windows.

{¶ 48} Before the lead opinion's nontestimonial/testimonial split, Monroe stated that her "ex" was the shooter and that "his name is Quantez Wilcox." After the split, she confirmed that "he's [her] ex" and that he was the shooter. Cumulative. Before the split, Monroe stated that she "made multiple . . . reports about [Wilcox] back when he busted out [her] windows." After the split, she described how she "constantly made reports" and how she "[saw] him busting [her] windows out." Cumulative. Before the split, Monroe stated that Wilcox had "shot at [her] car." After the split, she expressed that she "made a court, a report, [because] . . . [her] car was shot at." Cumulative. All cumulative.

{¶ 49} Because Monroe had already shared this information during the nontestimonial portion of the bodycam video, it couldn't have prejudiced Wilcox. It was merely cumulative and didn't impact the verdict. Because admitting the second part of the video didn't prejudice Wilcox, any error in its admission was harmless.

{¶ 50} The lead opinion doesn't dispute that the statements in the second half of the video were cumulative of those in the first. (How could it?) Yet it refuses to state the obvious: that even under its theory that the second half of the video was testimonial, there was no prejudicial error in violation of the

Confrontation Clause because the statements in the second half were cumulative of those in the first. Instead, it wants to send the case back to the First District with the Confrontation Clause issue unresolved.

{¶ 51} In its opinion, the First District held that all the statements in the video were testimonial.[3] We accepted this case to review that holding. We unanimously agree that the First District was wrong as a matter of constitutional law, and as the lead opinion makes clear, that is the only issue before us today. There is simply no reason not to resolve the Confrontation Clause issue here. The record makes abundantly clear that even under the lead opinion's theory that the statements in the second half of the video were testimonial, there was no prejudicial error in violation of the Confrontation Clause. We should say so.

## IV. Conclusion

{¶ 52} The primary purpose of Officer Price's questioning was to facilitate a police response to an ongoing emergency. Monroe's statements in the entirety of the bodycam video were therefore nontestimonial. But even assuming that the lead opinion's nontestimonial/testimonial split is right, the trial court's admission of the second part of the video was harmless error. I would therefore reverse the First District Court of Appeals' judgment on the Confrontation Clause issue and remand the case for it to consider the remaining assignments of error.

_____

3. The First District should have adhered to the "well established" constitutional-avoidance principle that "this court will not reach constitutional issues unless absolutely necessary," and decided the evidentiary hearsay issue before reaching the constitutional Confrontation Clause issue. *State v. Talty*, 2004-Ohio-4888, ¶ 9. It is true that in at least one case, a prior court overlooked this rule. *See State v. Jones*, 2012-Ohio-5677, ¶ 136. But our more consistent practice has been to adhere to the constitutional-avoidance principle in cases like these. *See, e.g., State v. Beasley*, 2018-Ohio-493, ¶ 165-188; *State v. McKelton*, 2016-Ohio-5735, ¶ 181-185; *State v. Fry*, 2010-Ohio-1017, ¶ 100-101. As we recently explained, it is a "principle of judicial restraint . . . that courts should not decide constitutional questions unless it is absolutely necessary to do so." *Epcon Communities Franchising, L.L.C. v. Wilcox Dev. Group, L.L.C.*, 2024-Ohio-4989, ¶ 17.

Melissa A. Powers, Hamilton County Prosecuting Attorney, and Paula E. Adams, Assistant Prosecuting Attorney, for appellant.

Elizabeth R. Miller, Ohio Public Defender, and Mallorie Thomas, Assistant Public Defender, for appellee.

Dave Yost, Attorney General, T. Elliot Gaiser, Solicitor General, Michael J. Hendershot, Chief Deputy Solicitor General, and Samuel C. Peterson, Deputy Solicitor General, urging reversal for amicus curiae Ohio Attorney General Dave Yost.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Daniel T. Van and Kristen Hatcher, Assistant Prosecuting Attorneys, urging reversal for amicus curiae Cuyahoga County Prosecutor's Office.

Russell S. Bensing, in support of appellee, for amicus curiae Ohio Association of Criminal Defense Lawyers.

_____